No. 23-15613

_____

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

UNITED STATES OF AMERICA, EX REL. ZACHARY SILBERSHER, Relator,
*Plaintiff-Appellant,*

v.

ALLERGAN, INC.; ALLERGAN USA, INC.; ALLERGAN SALES, LLC; FOREST LABORATORIES HOLDINGS, LTD.; ADAMAS PHARMA LLC; AND ADAMAS PHARMACEUTICALS, INC.,
*Defendants-Appellees.*

_____

Appeal from the United States District Court for the Northern District of California Civil Case No. 3:18-cv-03018-JCS (Honorable Joseph C. Spero)

_____

## APPELLANT'S BRIEF

_____

Nicomedes Sy Herrera
Bret D. Hembd
HERRERA KENNEDY LLP
1300 Clay Street, Suite 600
Oakland, CA 94612
510.422.4700

Tejinder Singh
SPARACINO PLLC
1920 L St. NW, Suite 835
Washington, DC 20036
202.629.3530

Warren T. Burns
Christopher J. Cormier
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
469.904.4550

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................ii

INTRODUCTION .............................................................................. 1

JURISDICTIONAL STATEMENT ..................................................... 5

ISSUES PRESENTED FOR REVIEW .............................................. 5

STATEMENT REGARDING ADDENDUM ....................................... 5

STATEMENT OF THE CASE ............................................................ 5

    I.    Background ........................................................................ 5

       A. The False Claims Act and the Public Disclosure Bar ................ 5

       B. Plaintiff's Allegations ................................................... 12

    II.   Procedural History and the Ruling Below .................................. 20

SUMMARY OF ARGUMENT ........................................................... 26

STANDARD OF REVIEW ................................................................ 28

ARGUMENT ................................................................................... 29

    I.    The Publicly Disclosed Allegations or Transactions Are Not
        "Substantially the Same" as Those Alleged in Plaintiff's
        Complaint ........................................................................ 29

    II.   Plaintiff Is an Original Source ................................................ 44

       A. Plaintiff's Expertise in Patent Law, and Specifically
         Pharmaceutical Patents, Qualifies as "Knowledge" ................. 45

       B. Plaintiff's Knowledge Is "Independent of" the Publicly Disclosed
         Transactions ................................................................ 55

       C. Plaintiff's Knowledge "Materially Adds" to the Publicly
         Disclosed Transactions .................................................. 58

       D. Plaintiff Voluntarily Provided the Relevant Information to the
         Government Before Filing This Lawsuit .............................. 72

CONCLUSION ............................................................................... 73

ADDENDUM ............................................................................... A1

# TABLE OF AUTHORITIES

## Cases

*Amphastar Pharms. Inc. v. Aventis Pharma SA,*
856 F.3d 696 (9th Cir. 2017) ......................................................... 56, 57

*ASARCO, LLC v. Union Pac. R.R. Co.,*
765 F.3d 999 (9th Cir. 2014) ............................................................... 29

*Badgerow v. Walters,*
142 S. Ct. 1310 (2022) ........................................................................ 49

*BTG Int'l Ltd. v. Amneal Pharms. LLC,*
923 F.3d 1063 (Fed. Cir. 2019) ........................................................... 14

*Cmty. House, Inc. v. City of Boise,*
623 F.3d 945 (9th Cir. 2010) ............................................................... 41

*Cook County v. United States ex rel. Chandler,*
538 U.S. 119 (2003) .............................................................................. 6

*Dream Palace v. Cty. of Maricopa,*
384 F.3d 990 (9th Cir. 2004) ......................................................... 41, 42

*Elec. Frontier Found. v. Off. of Dir. of Nat. Intel.,*
2009 WL 773340 (N.D. Cal. Mar. 23, 2009) ....................................... 42

*Ginzburg v. Martinez-Davila,*
2021 WL 4352377 (C.D. Cal. Aug. 12, 2021) ...................................... 42

*Glaser v. Wound Care Consultants, Inc.,*
570 F.3d 907 (7th Cir. 2009) ............................................................... 63

*IBP, Inc. v. Alvarez,*
546 U.S. 21 (2005) ............................................................................... 51

*Illinois ex rel. Edelweiss Fund LLC v. JPMorgan Chase & Co.,*
No. 2017-L-000289 (Ill. Cook. Cnty. Feb. 1, 2019) ............................. 61

*In re Howell,*
    731 F.2d 624 (9th Cir. 1984) ............................................................ 41

*Keating v. Off. of Thrift Supervision,*
    45 F.3d 322 (9th Cir. 1995) .............................................................. 43

*Lomax v. Ortiz-Marquez,*
    140 S. Ct. 1721 (2020) ..................................................................... 49

*Malhotra v. Steinberg,*
    770 F.3d 853 (9th Cir. 2014) ............................................................ 72

*Nadarajah v. Holder,*
    569 F.3d 906 (9th Cir. 2009) ............................................................ 47

*Nat. Res. Def. Council, Inc. v. Winter,*
    543 F.3d 1152 (9th Cir. 2008) .......................................................... 47

*Pierce v. Underwood,*
    487 U.S. 552 (1988) ......................................................................... 47

*Rockwell Int'l Corp. v. United States,*
    549 U.S. 457 (2007) ......................................................................... 52

*Roe v. Stanford Health Care,*
    2022 WL 796798 (9th Cir. Mar. 15, 2022) ...................................... 66

*Schindler Elevator Corp. v. United States ex rel. Kirk,*
    563 U.S. 401 (2011) ........................................................................... 7

*Silbersher v. Valeant Pharms. Int'l, Inc.,*
    --- F.4th ----, 2023 WL 4940429 (9th Cir. Aug. 3, 2023) ............. *passim*

*Singleton v. Wulff,*
    428 U.S. 106 (1976) ......................................................................... 41

*Teva Pharms. USA, Inc. v. Sandoz, Inc.,*
    574 U.S. 318 (2015) ......................................................................... 47

iii

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
142 S. Ct. 941 (2022) ............................................................... 46

*United States ex rel. Campie v. Gilead Scis., Inc.*,
862 F.3d 890 (9th Cir. 2017) ..................................................... 6

*United States ex rel. Hendow v. Univ. of Phoenix*,
461 F.3d 1166 (9th Cir. 2006) .................................................... 6

*United States ex rel. Holloway v. Heartland Hospice, Inc.*,
960 F.3d 836 (6th Cir. 2020) .................................................... 11

*United States ex rel. Jones v. Sutter Health*,
499 F. Supp. 3d 704 (N.D. Cal. 2020) ....................................... 67

*United States ex rel. Mateski v. Raytheon Co.*,
816 F.3d 565, 571 (9th Cir. 2016) ............................................ 11

*United States ex rel. Moore & Co., P.A. v. Majestic Blue*
*Fisheries, LLC*,
812 F.3d 294 (3d Cir. 2016) ............................................... 9, 59

*United States ex rel. Osheroff v. Tenet Healthcare Corp.*,
2012 WL 2871264 (S.D. Fla. July 12, 2012) ............................ 62

*United States ex rel. Rahimi v. Rite Aid Corp.*,
3 F.4th 813 (6th Cir. 2021) ..................................................... 55

*United States ex rel. Reed v. KeyPoint Gov't Sols.*,
923 F.3d 729 (10th Cir. 2019) ............................................ 59, 66

*United States ex rel. Schutte v. SuperValu Inc.*,
143 S. Ct. 1391 (2023) ....................................................... 51, 54

*United States Hastings v. Wells Fargo Bank, NA, Inc.*,
656 F. App'x 328 (9th Cir. 2016) ............................................. 67

*United States v Baccollo*,
725 F.2d 170 (2d Cir. 1983) ..................................................... 43

*United States v. Bank of Farmington,*
    166 F.3d 853 (7th Cir. 1999) ...................................................... 63

*United States v. Janssen Biotech, Inc.,*
    576 F. Supp. 3d 212 (D.N.J. 2021) ........................................... 43

*United States v. Neifert-White Co.,*
    390 U.S. 228 (1968) ...................................................................... 6

*United States v. Patrin,*
    575 F.2d 708 (9th Cir. 1978) ...................................................... 41

*Vess v. Ciba-Geigy Corp. USA,*
    317 F.3d 1097 (9th Cir. 2003) .................................................... 72

## Statutes

21 U.S.C. § 355(b)(1)(A)(viii) ...................................................... 19

21 U.S.C. § 355(b)(2)(A)(iv) ........................................................ 19

28 U.S.C. § 1291 ............................................................................ 5

28 U.S.C. § 1331 ............................................................................ 5

31 U.S.C. § 3729(a)(1)(A) .............................................................. 5

31 U.S.C. § 3729(a)(1)(B) .............................................................. 5

31 U.S.C. § 3730(b)(1) .................................................................... 6

31 U.S.C. § 3730(b)(4) .................................................................... 6

31 U.S.C. § 3730(d) ........................................................................ 6

31 U.S.C. § 3730(e)(4) .................................................................. 10

31 U.S.C. § 3730(e)(4)(A) ........................................................ 2, 27

31 U.S.C. § 3730(e)(4)(A) (1986) .................................................. 7

31 U.S.C. § 3730(e)(4)(B) ...................................................... *passim*

31 U.S.C. § 3730(e)(4)(B) (1986) .................................... 7, 48, 56

35 U.S.C. § 103 ........................................................................ 14

## Regulations

37 C.F.R. § 1.56 ................................................................. 14, 36

37 C.F.R. § 11.7 ...................................................................... 47

## Rules

Fed. R. App. P. 35(a)(1) .......................................................... 42

Fed. R. Civ. P. 12(b)(6) ..................................................... 20, 29

Fed. R. Civ. P. 8 ...................................................................... 72

## Other Authorities

145 Cong. Rec. E1546-01 (daily ed. July 14, 1999), 1999 WL
495861 .................................................................... *passim*

Manual of Patent Examining Procedure § 2001 ................... 36

Merriam-Webster Dictionary (2023) ............................... 46, 55

S. Rep. No. 110-507 (2008) ....................................................... 8

S. Rep. No. 99-345  (1986) ............................................. 6, 7, 71

USPTO, General Requirements Bulletin for Admission to the
Examination for Registration to Practice in Patent Cases
before the United States Patent and Trademark Office (2023),
https://tinyurl.com/2facfh9c .............................................. 47

Webster's New Collegiate Dictionary  (1975) ....................... 51

# INTRODUCTION

This case arises under the False Claims Act, 31 U.S.C. §§ 3729−33 (FCA), which protects government programs from fraud. Plaintiff-appellant Zachary Silbersher—a patent attorney with deep background in the area of pharmaceutical patents—determined through careful analysis of defendant-appellees' submissions to the U.S. Patent and Trademark Office (USPTO), as well as additional sources, that defendants deceived the USPTO into extending the patent monopoly that prevented generic competitors from selling less expensive alternatives to two important drugs. This extended monopoly allowed defendants to overcharge the Government for these drugs, unlawfully extracting at least hundreds of millions of dollars from important public programs like Medicare and Medicaid. Silbersher brought an FCA action as a *qui tam* relator to help the Government recover these losses.

This appeal concerns an affirmative defense called the "public disclosure bar," which generally requires dismissal of FCA actions "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed" in specified forums, "unless the action is brought by the Attorney General or the person bringing the action is

1

an original source of the information." 31 U.S.C. § 3730(e)(4)(A). An "original source" includes an individual who "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." *Id.* § 3730(e)(4)(B).

The district court initially denied this motion to dismiss, holding that plaintiff's complaint states a claim and that the relevant disclosures, which occurred on patent prosecution dockets, did not fall within the public disclosure bar's enumerated channels and therefore did not constitute qualifying public disclosures. *See Silbersher v. Allergan Inc.*, 506 F. Supp. 3d 772 (N.D. Cal. 2020) (reproduced at ER-47–122). On defendants' interlocutory appeal, this Court reversed on the public disclosure issue only, holding that patent prosecution dockets fall within the enumerated channels, and so the public disclosure bar was triggered. *See United States v. Allergan, Inc.,* 46 F.4th 991 (9th Cir. 2022) (reproduced at ER-28–46). The Court remanded for the district court to consider whether plaintiff qualifies as an original source.

On remand, plaintiff argued that he is an original source because his independent knowledge—including specialized expertise in pharmaceutical patents—materially added to the publicly disclosed transactions by allowing him to uncover fraud where the Government otherwise could not. Specifically, plaintiff explained that the publicly disclosed information was facially innocuous and scattered across various hard-to-identify and highly technical sources—and it was only by applying his expertise, as well as substantial investigative effort, that plaintiff was able to discern that defendants had made material false statements to the USPTO, and that those statements led to patents being issued that allowed defendants' to block generic competition and therefore continue charging monopoly prices to the Government. The district court rejected the argument, holding that "knowledge" under the FCA's original source exception does not include expertise, but is instead limited to non-public knowledge of historical facts regarding defendants' conduct. *Silbersher v. Allergan Inc.*, 2023 WL 2593777, at *10−11 (N.D. Cal. Mar. 20, 2023) (reproduced at ER-9−27). Plaintiff timely appealed. ER-3−7.

3

After plaintiff filed his notice of appeal, this Court held—in a similar patent-based FCA action brought by the same plaintiff—that the public disclosure bar was not triggered. Although relevant information appeared in patent prosecution dockets and other public sources, the disclosures were not "substantially the same" as plaintiff's allegations. *Silbersher v. Valeant Pharms. Int'l, Inc.*, --- F.4th ----, 2023 WL 4940429, at *2 (9th Cir. Aug. 3, 2023). That was because "the scattered qualifying public disclosures each contains a piece of the puzzle, but none shows the full picture. In his *qui tam* action, Silbersher filled the gaps by putting together the material elements of the allegedly fraudulent scheme." *Id.* at *10.

This Court should reverse the district court for two independent reasons. First, for the reasons given in *Valeant*, any publicly disclosed transactions are not substantially the same as the fraud plaintiff alleges. Second, even if the public disclosure bar was triggered, plaintiff qualifies as an original source because his subject-matter knowledge and the conclusions it allowed him to draw are independent of and materially add to the publicly disclosed transactions.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over plaintiff's federal claims under 28 U.S.C. § 1331. It entered final judgment in defendants' favor on March 20, 2023. ER-8. Plaintiff timely appealed on April 19, 2023. ER-3−7. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

1.     Whether plaintiff's allegations are "substantially the same" as the publicly disclosed transactions.

2.     If the public disclosure bar applies, whether plaintiff may proceed as an original source of the information in his complaint.

## STATEMENT REGARDING ADDENDUM

Pertinent statutory authority is reproduced *infra* pp.A1−A8.

## STATEMENT OF THE CASE

### I.   Background

### A. The False Claims Act and the Public Disclosure Bar

The FCA creates civil liability for "any person who" "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval"—or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A), (B).

5

In enacting the FCA, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)). This includes cases in which an upstream fraud taints downstream claims for payment. *See, e.g.*, *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 904 (9th Cir. 2017); *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1173 (9th Cir. 2006).

The FCA authorizes suits by private persons, known as *qui tam* relators, on the Government's behalf. *See* 31 U.S.C. § 3730(b)(1). After a relator files suit, the Government has the option to intervene, or instead to allow the relator to carry the suit forward. *See id.* § 3730(b)(4). At the end of a successful case, the Government receives the lion's share of the recovery, and the relator up to 30%. *See id.* § 3730(d). The *qui tam* provisions are designed to "encourage any individual knowing of Government fraud to bring that information forward." S. Rep. No. 99-345, at 2 (1986). Congress determined that in the face of a "severe" problem of

fraud on the Government, "a coordinated effort of both the Government and the citizenry" was necessary. *Ibid*.

The public disclosure bar was inserted into the statute in 1986. As originally drafted, the public disclosure bar provided that no court would have "jurisdiction over an action under this section based upon the public disclosure of allegations or transactions" in certain enumerated channels "unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A) (1986). An "original source" was defined as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information." *Id*. § 3730(e)(4)(B) (1986).

The public disclosure bar seeks "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 413 (2011) (quotation marks and emphasis omitted). Consistent with the purpose of the 1986 amendments, that balance favors enforcement. "In creating both the public disclosure bar and the original source

exception," Congress's intent was "to only bar truly 'parasitic' lawsuits, such as those brought by individuals who did nothing more than copy a criminal indictment filed by the Government." S. Rep. No. 110-507, at 22 (2008). On the other hand, Congress sought "to ensure that any individual *qui tam* relator who came forward with legitimate information that started the Government looking into an area it would otherwise not have looked, could proceed with an FCA case." *Id*. at 5.

Unfortunately, courts misapplied the public disclosure bar to dismiss meritorious cases. This prompted Senator Grassley and Representative Howard Berman, the sponsors of the 1986 Amendments, to explain that the public disclosure bar, "which was drafted to deter so-called 'parasitic' cases, has been converted by several circuit courts into a powerful sword by which defendants are able to defeat worthy relators and their claims," in a manner that threatened to undermine "the very purpose" of the 1986 Amendments. 145 Cong. Rec. E1546-01 (daily ed. July 14, 1999), 1999 WL 495861, at *E1546.

In particular, the sponsors "disagree[d] with cases holding that *qui tam* suits are barred if the relator obtains some, or even all, of the information necessary to prove fraud from publicly available documents."

145 Cong. Rec. E1546-01, at *E1547. In their view, a relator "who uses their education, training, experience, or talent to uncover a fraudulent scheme from publicly available documents, should be allowed to file a *qui tam* action." *Ibid.* "This is especially true where a relator must piece together facts exposing a fraud from separate documents." *Ibid.*

The public disclosure bar's architects also disagreed with decisions limiting the original source provision to "eyewitness[es] to the fraudulent conduct as it occurs." 145 Cong. Rec. E1546-01, at *E1547. This interpretation threatened to "undermine Congress' explicit goals." *Ibid.* Instead, the sponsors explained that:

> [A] relator's knowledge of the fraud is "direct and independent" if it results from his or her own efforts. For example, a relator who learns of false claims by gathering and comparing data could have direct and independent knowledge of the fraud, regardless of his or her status as a [percipient] witness.

*Ibid.*

Starting in 2008, these legislators attempted to amend the public disclosure bar. Those efforts succeeded in 2010, when Congress "overhauled" and "radically changed" the statute to "lower the bar for relators." *United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 298-99 (3d Cir. 2016).

As amended, the public disclosure bar provides that:

> (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4).

Two changes are salient here. First, instead of having the public

disclosure bar triggered whenever the plaintiff's allegations are "based

upon" the publicly disclosed allegations or transactions, Congress provided that the publicly disclosed allegations or transactions must be "substantially the same" as those alleged in the complaint. This means that all the material elements of the fraud must be publicly disclosed before the public disclosure bar is triggered. *See, e.g.*, *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 571 (9th Cir. 2016). Thus, in *Valeant,* this Court held that when "scattered qualifying public disclosures each contain a piece of the puzzle, but none shows the full picture," and the relator's complaint "filled the gaps by putting together the material elements of the allegedly fraudulent scheme," the public disclosure bar is not triggered. *Valeant*, 2023 WL 4940429, at *10.[1]

Additionally, the definition of "original source" changed substantially. Rather than require relators to have direct and

---

[1] Other courts that previously adopted more expansive interpretations of "based upon" have changed course after the 2010 amendments. For example, the Sixth Circuit has recognized that "[f]rom a textual standpoint, 'substantially the same' facially demands a greater degree of similarity between the *qui tam* complaint and the prior disclosures than 'based upon' does." *United States ex rel. Holloway v. Heartland Hospice, Inc.*, 960 F.3d 836, 851 (6th Cir. 2020). In particular, under the amended statute, "there is no textual hook" for an argument that the public disclosure bar is triggered when a complaint is "even partly based upon" public disclosures—as some courts had held under the prior statute. *Ibid.*

independent knowledge of the information on which the allegations are based, and to provide that information to the Governmetn before suing, the exception now applies in two distinct situations: (1) if the relator voluntarily discloses "the information on which allegations or transactions in a claim are based" to the Government before a public disclosure occurs; or (2) if the relator "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," and voluntarily communicates that "information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B).

Under the first path, relators who communicate the information underlying their claims to the Government inoculate themselves from subsequent public disclosures. Under the second path, relators who have independent, materially valuable knowledge may proceed if they provide their information to the Government before suing—even though the material elements of the fraud were already publicly disclosed.

### B. Plaintiff's Allegations

The simplified version of plaintiff's allegations is that defendants lied to the USPTO to obtain patents protecting name-brand drugs, thus

extending their patent monopolies and forestalling generic competition. This fraud enabled defendants to preserve their market share and monopoly prices for these drugs so that they could continue to extract monopoly profits from all payors, including government health care programs. Such misconduct lies at the core of the FCA's prohibitions against using upstream fraud to taint downstream claims for payment.

In greater detail: Patents constitute a bargain between inventors and the public, whereby the inventor discloses his invention, receiving in exchange a finite monopoly over the invention for a period of years after which the invention becomes public domain. In the context of pharmaceuticals, patents allow manufacturers to profit from new drugs, and when the patents expire, competitors produce generic versions that bring the price down by as much as 90%. ER-149, ¶ 47.

Because sales of patented medicines are so profitable, some drug manufacturers seek to prolong their patent monopoly by obtaining additional patents protecting a drug after their original patents expire, restarting the monopoly clock. This is called "evergreening." It is hard to do (legitimately) because to be eligible for a patent, an applicant must show the USPTO that the claimed invention is not obvious. 35 U.S.C.

§ 103. When a patent seeks to protect a drug that has been on the market for years, that can be a challenge—but applicants can overcome it by pointing to so-called secondary considerations or "indicia of nonobviousness," including that the claimed invention produced unexpected results. *See, e.g.*, *BTG Int'l Ltd. v. Amneal Pharms. LLC,* 923 F.3d 1063, 1073 (Fed. Cir. 2019).

In seeking patents, applicants to the USPTO are bound by a duty of candor and good faith. *See* 37 C.F.R. § 1.56. Thus, applicants must tell the Government the truth, and also disclose any information material to the patentability of the claimed invention—including any information that undermines the claim to a patent. That is because patent examination is an *ex parte* proceeding during which the examiner relies on the applicant's representations to evaluate the application. *See Valeant,* 2023 WL 4940429, at *4.

Plaintiff's operative complaint (ER-136−225) alleges that defendant Allergan manufactures, sells, and distributes Namenda XR and Namzaric in partnership with defendant Adamas. ER-150−51, ¶¶ 49, 53. Both drugs share an active ingredient, memantine, used to treat dementia related to Alzheimer's disease. These drugs are expensive and

make serious money for defendants. In 2014 and 2015 alone, Medicare reimbursed approximately 5.4 million prescriptions for Namenda XR for approximately $1.46 billion. ER-175, ¶ 132.

Defendants fraudulently obtained a thicket of patents protecting Namenda XR and Namzaric. The first set of patents (comprising eleven separate patents), known as the Went Patents, were only granted because Dr. Gregory Went, the CEO of Adamas, misrepresented the results of a clinical study called the ME110 study. In a November 2010 declaration filed with the USPTO, Dr. Went falsely claimed that the ME110 study showed that the Namenda XR formulation had "no incidence of memantine-related CNS [central nervous system] side effects (0 out of 24 subjects)." In fact, the Namenda XR formulation had *greater* CNS side-effects than the prior formulation. ER-156–157, ¶¶ 67–70. This misrepresentation was critical in obtaining the Went Patents because the supposedly low incidence of side effects allowed defendants to persuade the USPTO that the Namenda XR formulation achieved "unexpected results," overcoming the objection that the claimed inventions were obvious and therefore unpatentable. ER-156, ¶ 73.

Went, Adamas, and Allergan's predecessor-in-interest (defendant Forest) continued to resubmit the same fraudulent data, and never corrected their misrepresentation, when applying for additional patents that together comprise the Went Patents, each time misleading the USPTO into granting the applications. ER-158−163, ¶¶ 73−90.

Plaintiff alleges that defendants knew the November 2010 declaration was false because they submitted in 2012 the actual results of the ME110 study in connection with a separate, abandoned patent application (the '824 Application) that is not otherwise relevant to this case. ER−156, ¶ 68. Plaintiff also alleges that the misrepresented results of the ME110 study were material to the Went Patents because, when the examiner viewed the actual results in connection with the '824 Application, she refused to grant the patent. ER-156−157, ¶¶ 68−70. The relevant Went Patents were subsequently found to be invalid; those findings were affirmed on appeal in February 2018; and generic competition began immediately thereafter. ER-151, ¶ 51; ER-167, ¶ 107.

The second relevant patent, the '009 Patent, was obtained by Forest—again by misleading the USPTO. The patent application had been rejected at least six times when Forest amended it to require "once

daily administration" of the drug. ER-164, ¶ 96. Forest claimed that this was a novel feature—but in fact it was obvious in view of the teachings in a separate patent, U.S. Patent No. 6,479,553 ("the '553 Patent"), which expressly teaches treating Alzheimer's disease by administering memantine once daily. ER-164, ¶ 93. Although Forest was aware of the '553 Patent, it misleadingly omitted any reference to that patent after changing its application to require once-daily administration. Had Forest candidly disclosed the '553 Patent after it amended its application, the '009 Patent would not have issued. ER-164, ¶ 97.

Plaintiff's complaint includes additional facts substantiating the elements of fraud. For example, plaintiff discovered that the ME110 study refuted any inference of "unexpected results" in a separate study (called the C106 Study) that defendants also relied upon in their application. Specifically, plaintiff's investigation revealed that the ME110 study data that defendants withheld from the USPTO would have, if disclosed, proven that the C106 Study was incomplete by having omitted possible side effects related to dizziness and anxiety. ER-162–63, ¶¶ 86–88.

17

Plaintiff also reviewed the patent prosecution files to determine that defendants' misrepresentations were material to the decision to grant the Went Patents and the '009 Patent, *e.g.,* ER-163−64, ¶¶ 90, 94. These allegations resulted from plaintiff's analysis—the patent filings themselves do not disclose whether they contained misstatements that were material to the USPTO's decision to grant the applications.

Plaintiff's work did not end there. Plaintiff discovered and developed information revealing the nature of defendants' fraudulent scheme that was nowhere in the patent prosecution history or in the electronic patent docket that the USPTO makes available online.

For example, plaintiff alleges that one critical step in defendants' scheme was to list thirteen patents, including the Went Patents and the '009 Patent, in the U.S. Food and Drug Administration (FDA)'s list of Approved Drug Products with Therapeutic Equivalence Evaluations (commonly referred to as the "Orange Book"). ER-139−178, ¶¶ 1, 34−35, 42, 50, 57-58, 105, 106, 144. This listing was itself a false statement to the Government that was critical to excluding generic competitors. ER-178, ¶ 143. This was because, once a patent is listed in the Orange Book, a generic competitor seeking to enter the market without first

waiting for that patent to expire must certify in their Abbreviated New Drug Application (ANDA) that the listed patent is either invalid or will not be infringed by the generic equivalent. That certification triggers an automatic 30-month stay during which the FDA may not approve a competitor's ANDA. ER-148, ¶ 43; 21 U.S.C. § 355(b)(2)(A)(iv). Accordingly, defendants were only permitted to list patents they reasonably believed were valid and enforceable, 21 U.S.C. § 355(b)(1)(A)(viii); but because defendants knew the patents they listed were obtained by fraud, they made additional false certifications to the Government that substantially delayed generic competition (and therefore contributed to overcharging). ER-178, ¶¶ 143−44.

Plaintiff also investigated causation by evaluating the various ANDAs filed with the FDA by sixteen drug companies capable of introducing lower-priced generics and analyzed these filings against the patent thicket that defendants listed in the Orange Book. ER-166−69. ¶¶ 104−109; ER-178−79, ¶¶ 141−47. Based on this analysis, plaintiff determined that the listed patents were invalid or would not have prevented generic competition—which meant that but for the Went Patents and the '009 Patent, Namenda XR and Namzaric would have had

19

to face competition. ER-167, ¶ 107 & Chart 1; ER-168−69, ¶¶ 108−09 & Chart 2. Plaintiff also reviewed market information to confirm that generic manufacturers were able and ready to enter the market. *Ibid*; ER-177−78, ¶¶ 140−42. And he studied how defendants used the Went Patents and the '009 Patent to block generic competitors. ER-167, ¶ 107 & Chart 1; ER-168−69, ¶¶ 108−09 & Chart 2; ER-177−78, ¶¶ 140−42.

Plaintiff went further still, showing how defendants' unlawful patent monopoly resulted in the presentment of false claims for payment to the Government and the use of false statements related to drug pricing, in violation of the FCA. ER-169−71, ¶¶ 111−18; ER-180−82, ¶¶ 155(a)−(g). Based on his exhaustive investigation, plaintiff sought relief under the FCA and state counterparts to recover billions of dollars in overcharges. ER-174−77, ¶¶ 128−39; ER-183−225, ¶¶ 161−551.

## II. Procedural History and the Ruling Below

Plaintiff's original complaint was filed May 22, 2018. ER-238. The operative amended complaint was filed January 22, 2019. ER-136. Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6), raising, among other issues, the public disclosure bar.

The district court denied defendants' motions on December 12, 2020. *Silbersher v. Allergan Inc.*, 506 F. Supp. 3d 772 (N.D. Cal. 2020); ER-47−122. Regarding the public disclosure bar, the court held that the transactions in this case were disclosed in patent prosecution dockets— but that such dockets did not fall within the public disclosure bar's enumerated channels, and so the bar was not triggered. ER-92. Regarding the merits of plaintiff's claims, the district court held that plaintiff's allegations sufficiently pleaded false claims under the FCA because plaintiff showed, with particularity, that defendants had obtained fraudulent patents and knowingly used them to overcharge the Government for these medicines. ER-109−121.

Defendants sought interlocutory appeal, arguing that the district court's decision was inconsistent with the district court's (subsequently reversed) decision in *Silbersher v. Valeant Pharmaceuticals International, Inc.*, 445 F. Supp. 3d 393, 396 (N.D. Cal. 2020), *rev'd and remanded*, 2023 WL 4940429 (9th Cir. Aug. 3, 2023), which held that the public disclosure bar applied to other claims brought by the same plaintiff against different defendants. This Court granted defendants' petition for interlocutory appeal and reversed on public disclosure grounds only,

holding that patent prosecutions qualify as federal hearings, such that disclosures therein could trigger the public disclosure bar. *United States v. Allergan, Inc.*, 46 F.4th 991 (9th Cir. 2022) (reproduced at ER-28−46). The Court declined to reach plaintiff's argument that the public disclosures were not substantially the same as his allegations, concluding that this argument had been waived in the district court. *See* ER-39, n.6. The Court held, however, that "[e]ven though the public disclosure bar is triggered, Silbersher may still bring his *qui tam* action if he is an 'original source' of the information in his complaint," and remanded to the district court to decide that question. ER-46.

On remand, the district court again concluded that the patent prosecution files disclose substantially the same transactions as plaintiff's complaint, and further held that plaintiff is not an original source. ER-23−26.

As to whether the patent prosecution files disclosed substantially the same transactions, the court adhered to its prior ruling, reasoning that the patent prosecution files reveal "both the true and false state of affairs with respect to the alleged fraud." ER-23.

The district court acknowledged that plaintiff identified six categories of information not in the patent prosecution files, including: (1) The 2010 Went Declaration was false and misleading, and the true results undermined defendants' representations of novelty; (2) the '553 Patent became newly relevant and therefore material only after the application for the fraudulent '009 Patent was amended, so that defendants' failure to disclose that information after amending the application was misleading and violated defendants' duty of candor and good faith; (3) the '553 Patent was prior art based on plaintiff's calculation of the priority date of the '009 Patent; (4) defendants' misstatements were intentional; (5) the Went Patents and the '009 Patent were the key patents preventing sixteen potential generic competitors from entering the market, based on plaintiff's analysis of all of the patents in the thicket; and (6) defendants' false and misleading statements identified in the complaint tainted the critical portions of each of the Went Patents and the '009 Patent that were actually effective in preventing generic entry. ER-21–22. These categories are discussed in greater detail *infra* pp.33-38.

23

Nevertheless, the district court held that this information "amount[ed] to conclusions [plaintiff] drew from analyzing the prosecution history using his specialized expertise" and therefore "do not change the Court's conclusion that the public patent files disclosed the transactions that Relator alleges were fraudulent." ER-23. The court also noted that plaintiff "conceded at the hearing on the previous motion to dismiss that the patent files contain 'the relevant information from which the inference of fraud could be drawn.'" *Ibid.* (citing ER-131).

With respect to plaintiff's original source qualification, the district court held that, under precedents interpreting the pre-amendment public disclosure bar, it is not enough for a relator to apply experience or training to facts that were publicly disclosed. ER-25−26. The court then concluded that the same is true under the current statute. Specifically, the court held that specialized expertise does not qualify as "'independent' knowledge under the 'original source' exception," because the court believed that the word "independent" requires the relator to have "had relevant evidence of fraud prior to the public disclosure of the allegations." ER-25 (quotation marks omitted).

24

The court also believed that the word "information"—which appears in the requirement that the relator provide information to the Government before commencing the action—"refers to the historical facts relating to the alleged fraud rather than any specialized expertise the relator brought to bear in order to discern those facts." ER-25. In the district court's view, it "would make little sense if the 'information' the relator was required to provide . . . was their specialized expertise." *Ibid*. The court inferred that "knowledge" likewise could not include expertise.

Although the court recognized that "there is no binding authority on the question," and further recognized that "there are certainly statements in the legislative history suggesting that some legislators would have liked to expand the definition to the extent Relator proposes," it concluded that "Congress did not expand the definition of an original source so broadly as to encompass the type of knowledge that Relator brings to bear in this case." ER-26. The court accordingly concluded that the public disclosure bar dooms plaintiff's federal claims, and that amendment would be futile. *Ibid*. It dismissed the federal claims with prejudice, and the state claims without prejudice. ER-26−7. After the court entered final judgment, plaintiff timely appealed. ER-3−7.

## SUMMARY OF ARGUMENT

The district court's decision should be reversed. The public disclosure bar seeks to stop parasitic lawsuits where relators do no meaningful work to discover fraud, but instead bring claims based on misconduct already in plain view. Such individuals add almost nothing to the Government's enforcement efforts, and therefore do not earn the rewards Congress allocated to relators. Here, by contrast, plaintiff was only able to discern defendants' fraud by spending years training to develop specialized expertise in patent law (specifically pharmaceutical patents), followed by months of hard work applying that expertise to carefully review defendants' submissions to the USPTO and the surrounding pharmaceutical market conditions. That fraud would have gone unnoticed without plaintiff's efforts, and the FCA seeks to encourage such efforts—not stifle them.

There are two paths to the correct result in this appeal. The easiest and most straightforward way is to apply this Court's intervening, on-point precedential decision in *Valeant* to hold that the public disclosure bar has not been triggered because the qualifying public disclosures are not substantially the same as the transactions described by plaintiff in

the complaint. In *Valeant*, the Court held that when Silbersher scrutinized and compared disparate patent filings to uncover inconsistencies that reveal fraud, no public disclosure occurred. That is because the public materials conveyed facially innocuous information that did not disclose the material elements of the alleged fraud; instead, those allegations flowed from Silbersher's efforts and insights. The disclosures in this case are indistinguishable from the ones in *Valeant*, and so the result must be the same. *Valeant* constitutes important precedent decided after the district court rendered its decision. This Court can and should apply it for the first time on appeal because doing so will bring clarity to the law and also obviate the need to decide questions of first impression regarding the scope of the original source exception.

The second path to reversal is to hold that if the public disclosure bar has been triggered, plaintiff qualifies as an original source under the plain meaning of the FCA's definition of "original source"—which requires a plaintiff to have "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions," 31 U.S.C. § 3730(e)(4)(A). Plaintiff's knowledge of patent law and expertise

27

in assessing pharmaceutical patents plainly count as "knowledge." Such knowledge is "independent of" the publicly disclosed transactions because it was not derived from the disclosure of those transactions—but was instead garnered through years of study preceding those disclosures. And plaintiff's knowledge "materially adds" to the public disclosures because it is essential to understanding how such facially innocuous and disconnected statements actually denote fraud, in a way that an average member of the public—or even an average government official responsible for policing fraud—could not. The district court's decision to the contrary is at odds with the statute's plain meaning, its amendment history and intent, and this Court's intervening decision in *Valeant*, which establishes that knowledge like plaintiff's is critical to redress novel, complex frauds.

## STANDARD OF REVIEW

This case is at the pleading stage, and the public disclosure bar is an affirmative defense on the merits. The Court should review the district court's decision dismissing the complaint *de novo*, and reverse unless "the defendant shows some obvious bar to securing relief on the face of the complaint." *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1004

(9th Cir. 2014). "If, from the allegations of the complaint as well as any judicially noticeable materials, an asserted defense raises disputed issues of fact, dismissal under Rule 12(b)(6) is improper." *Ibid*.

## ARGUMENT

### I. The Publicly Disclosed Allegations or Transactions Are Not "Substantially the Same" as Those Alleged in Plaintiff's Complaint

The public disclosure bar does not apply to all information in the public domain. Instead, it applies only if "substantially the same allegations or transactions as alleged in the" complaint, i.e., the fraud, were publicly disclosed in one of the channels specified in the statute. 31 U.S.C. § 3730(e)(4)(A). In the prior appeal, the panel held that information disclosed on patent prosecution dockets can qualify as a public disclosure. ER-43. The district court held that this information disclosed substantially the same transactions as plaintiff's complaint. ER-23. That conclusion was incorrect under this Court's subsequent decision in *Valeant*.

In *Valeant*, the Court considered allegations similar to those here, but reached the opposite result from the district court. Specifically, in *Valeant*, plaintiff alleged that Valeant Pharmaceuticals, the

manufacturer of the ulcerative colitis drug Apriso, was about to lose its patent protection because a group of patents protecting the drug (called the Otterbeck Patents) were weak and facing challenges. 2023 WL 4940429, at \*4. The manufacturer "sought to extend its monopoly by applying for a new patent, claiming it had recently discovered that Apriso was effective when taken without food." *Ibid.* However, a pair of scientific studies had previously reported that Apriso's active ingredient, mesalamine, was effective when taken without food. Plaintiff also found a previous patent application where the defendant claimed to have made the unexpected finding that taking a drug that defendant claimed was in the same class as Apriso *with food* made the drug more effective. "In other words, the [earlier] application claimed it was *obvious* that mesalamine was effective without food—the exact opposite of what Valeant would claim a few years later" in a different patent application. *Id.* at \*5.

The defendants in *Valeant* argued that the public disclosure bar applied, and the district court agreed. This Court reversed. The Court explained that even before the statute was amended in 2010 to require public disclosures to be "substantially the same" as the relator's allegations, this Court had interpreted the public disclosure bar to

require public disclosures to be "substantially similar to" the relator's allegations. *Valeant*, 2023 WL 4940429, at *9. The Court acknowledged the prior panel's decision in this case holding that information disclosed in patent prosecution dockets falls within the public disclosure bar's enumerated channels. *See id.* at *7. But it held that no public disclosure had occurred because the information disclosed in the patent prosecutions files of two separate applications (which included contradictory representations by the defendant) was not substantially the same as plaintiff's allegations. *See id.* at *8-10.

The Court in *Valeant* recognized that no direct allegation of fraud had been publicly disclosed, and so the question was whether the fraudulent transactions had been disclosed. *Valeant*, 2023 WL 4940429, at *9. The Court explained that under this Court's precedents, the disclosure of a fraudulent transaction requires the disclosure of both a misrepresented state of affairs and the true state of affairs, in a manner that reveals the material elements of the alleged fraud. This test is often expressed algebraically as X+Y=Z, where X is the misrepresented state of affairs; Y is the true state; and Z is an inference of fraud. *See ibid.*

Before *Valeant*, it was unclear how the X+Y=Z test would apply in these circumstances. This Court clarified the law by applying that test to the relevant disclosures—including patent prosecution histories, a Law360 article discussing the invalidation of Valeant's patent, and scientific studies—holding that when "scattered disclosures possibly reveal both" the misrepresented and true state of affairs, "but never the combination of the two," fraud has not been publicly disclosed. *Valeant*, 2023 WL 4940429, at *10. Instead, "Silbersher's *qui tam* allegations provide a critical fact necessary for scienter: [the defendants] took conflicting positions in their patent prosecutions"; and "[n]either of these patent prosecutions, or any other disclosure, reveals that fact." *Ibid*. With respect to a Law360 article reporting the finding that the defendant's patent was invalid, the Court concluded that although the article revealed that the patent was invalid, it did "not disclose—nor even imply—that Valeant knowingly withheld information when applying for the" patent. *Ibid*. Similarly, although the scientific studies "reinforce[d] that Valeant understood the obviousness of Apriso's food-free effectiveness," they did not "say anything about Valeant's application for the" patent. *Ibid*. And, the Court concluded, "none of the qualifying

disclosures . . . makes any mention of the Otterbeck Patents, much less disclose anything about the validity of these patents." *Ibid*. In sum, "no public disclosure here, individually or in combination, establishes facts from which fraud could be inferred. It is the combination of disclosures and conduct alleged in Silbersher's complaint that bring together the constituent elements of fraud." *Ibid*.

The same logic compels the same result here. Plaintiff's specialized knowledge allowed him to allege the following six categories of facts, which were not in the public sources, and which a lay person could not have alleged:

(1) That Dr. Went's November 5, 2010 declaration was false or misleading. *See* ER-21. Here, as in *Valeant*, no public source reports this fact. Plaintiff deduced it by comparing two separate patent applications, identifying contradictions between them, and resolving that tension. That is exactly the sort of analysis this Court found to defeat a public disclosure defense in *Valeant*. *See* 2023 WL 4940429, at *10 (explaining that "Silbersher's *qui tam* allegations provide a critical fact necessary for scienter: Falk and Valeant took conflicting positions in their patent prosecutions of [two] Patents. Neither of these patent prosecutions, or

any other disclosure, reveals that fact."). Similarly, here, the public disclosures do not resolve whether the discrepancy between Dr. Went's statements concerning "no incidence" of side effects in 2010 is materially inconsistent with his 2012 statements, much less that the inconsistency was important to patentability. And just as in *Valeant*, no public source discloses that Dr. Went's November 5, 2010 declaration was false, let alone intentionally false. That information came from plaintiff in paragraphs 67, 68, 74-78, and 81-84 of the complaint. ER-156, 158–62.

Relatedly, plaintiff showed that the accurate results reported in 2012 for the ME110 study undermined defendants' reliance on another study they cited in the patent application, the C106 study, which would have caused the patent examiner to question all of the results provided in the C106 study cited by defendants, which is also relevant to assessing the materiality of defendants' misrepresentations. ER-162–63, ¶¶ 85-88. No qualifying public source questioned the C106 study.

(2) That the '553 Patent became newly relevant to the application for the '009 Patent after the latter application was amended to require a once-daily limitation that had already been taught in the '553 Patent, such that the omission of the '553 Patent after amendment was a

material misleading omission. ER-21. Based on his specialized knowledge, plaintiff provided the information concerning the misleading nature of defendants' omission in paragraphs 94 through 98 of the complaint, and this information is not found in any qualifying public source. ER-164−65.

(3) That the '553 Patent must be considered prior art based on the calculated priority date for the '009 Patent. ER-21. Plaintiff was the one who determined this by applying the rules applicable at the time (which later changed). ER-164, ¶ 95. Thus, plaintiff's knowledge allowed him to provide important information to the Government that appears nowhere in the patent prosecution files, or any other public source.

(4) That the misstatements in defendants' patent applications were intentional, as described in paragraphs 68 through 83 of the complaint. ER-21; ER-156−61. Plaintiff's expertise, gleaned from years as a practicing patent attorney, enabled him to recognize when misleading statements by patent applicants are likely to be intentional (and therefore fraudulent), versus merely negligent, particularly in light of the duty of candor and good faith under the patent rules. *See* Manual of

Patent Examining Procedure § 2001; 37 C.F.R. § 1.56; ER-149, ¶ 46; ER-165, ¶ 99; *see generally* ER-156−61, ¶¶ 68−83.

(5) That the Went Patents and the '009 Patent were the key patents preventing generic competitors from entering the market. ER-22. This Court found it significant in *Valeant* that "none of the qualifying disclosures . . . ma[de] any mention of the Otterbeck Patents, much less disclose[d] anything about the[ir] validity." 2023 WL 4940429, at *10. In *Valeant*, that information was relevant to causation: the invalidity of the Otterbeck Patents meant that the fraudulently obtained patents were the lynchpin to the continued patent monopoly. The same is true here. At least thirteen patents listed in the Orange Book could have affected the ability of generic manufacturers to enter the market for Namenda XR and Namzaric. Nothing in the patent prosecution files or any other alleged source of public disclosure contained information revealing which, if any, of the sixteen potential generic competitors listed in paragraph 107 of the complaint (ER-167) or the six generic competitors listed in paragraph 108 of the complaint (ER-168) would have been able to enter the market and lower the price of Namenda XR or Namzaric based on the validity or invalidity of any, some, or all of the thirteen listed

patents in the Orange Book (or any discrete portions thereof). Plaintiff—and not any public disclosure—determined that the patents other than the Went Patents and the '009 Patent were either invalid or posed no barrier to generic entry. ER-167, ¶ 107 & Chart 1; ER-168, ¶¶ 108-09 & Chart 2. Plaintiff also determined which critical portions and claims in the Went Patents and the '009 Patent were fraudulent and which effectively prevented generic entry (such as, for example, which were the critical and fraudulent independent versus dependent claims) based on the market and regulatory environment affecting each of sixteen potential generic competitors, the precise patent infringement claims, and the status of the competitors' regulatory approval applications with the FDA. ER-166−69. ¶¶ 104−109; ER-177−78, ¶¶ 140−42; ER-178−79, ¶¶ 141−47.

(6) That the false and misleading statements in defendants' patent applications tainted critical portions and claims of each of the relevant patents, which directly resulted in excluding specific competitors from entering the market. ER-22. The fraudulent scheme identified in the complaint encompasses listing fraudulently obtained patents in the Orange Book to force ANDA filers to file Paragraph IV certifications and

endure months of additional delay. The scheme also included assertion of fraudulent patents against generic competitors to unlawfully inflate the prices that the Government paid for the drugs, and also to take away the Government's ability to choose less-expensive generics that would be sold by defendants' competitors. The new information that plaintiff provided to the Government contained in paragraphs 58-61, 74-76, 80-81, 91-97, and 103 of the complaint is critical in establishing how the various false and misleading statements made by defendants infected each of the listed patents, and how defendants' litigation positions in infringement actions filed against generic competitors were instrumental in keeping those competitors from entering the market and therefore inflating the price the Government paid. ER-152–53; ER-158–61; ER-163–64; ER-166. This critical information, which was the fruit of plaintiff's painstaking analysis and research, appears nowhere in the public sources, but rather was provided to the Government and included in plaintiff's complaint, all as the result of plaintiff's independent knowledge.

In summary, here, as in *Valeant*, no public disclosures, individually or in combination, disclosed fraud. At most, the scattered disclosures revealed facially innocuous information that a knowledgeable expert

*could use* to infer defendants' fraud after painstaking research and analysis. Expressed in the terms of the algebraic X+Y=Z test, the disclosures did not reveal Y (the true state of affairs), let alone the combination of X and Y that shows Z. Instead, they revealed facts that could allow a small number of experts to infer Y, and to then conduct further analysis to infer Z, but only after identifying relevant applicable references among millions of potential, difficult-to-access data sources. Under *Valeant*, the antecedent public disclosures are not "substantially the same" as the transactions in plaintiff's complaint, and so the public disclosure bar does not apply.

The decision in *Valeant* constitutes intervening authority that was not available when the motion to dismiss was litigated, nor when the district court determined that the public disclosures in this case were substantially the same as plaintiff's allegations. This Court should apply *Valeant* in the first instance to determine whether the district court's conclusion was correct.

As the district court noted, plaintiff's counsel conceded at oral argument in 2019 that the patent prosecution files contained "the relevant information from which the inference of fraud [on the USPTO]

could be drawn." ER-23. Based on this concession, this Court previously found that the "substantially the same" argument to be waived, and therefore did not reach the issue on the merits. ER-39, n.6.

Plaintiff did not have the benefit of the *Valeant* decision when he made that concession. And under *Valeant*, plaintiff's concession does not resolve the "substantially the same" issue against him under the facts of this case. In particular, *Valeant* has now clarified that "scattered qualifying public disclosures" that "each contain a piece of the puzzle" but do not reveal the "full picture" are not substantially the same as a *qui tam* complaint that "fill[s] the gaps by putting together the material elements of the allegedly fraudulent scheme." *Valeant*, 2023 WL 4940429, at *10. That sort of gap-filling is what plaintiff *always* argued that he did (albeit under the rubric of the original source analysis before *Valeant*).

Accordingly, even in light of plaintiff's concession, this Court should in the interests of justice consider this issue after *Valeant*. It is well-settled that this Court may consider an issue that was "raised but conceded" when either (i) a new argument has "come to light during the pendency of the appeal because of a recent change in the law," or (ii)

"[w]hen the issue conceded or neglected in the trial court is purely one of law and . . . the pertinent record has been fully developed," as long as the other party is not prejudiced. *United States v. Patrin*, 575 F.2d 708, 712 (9th Cir. 1978); *see, e.g.*, *Cmty. House, Inc. v. City of Boise*, 623 F.3d 945, 968 (9th Cir. 2010) (court of appeals can decide an issue in the first instance if it "is a pure question of law and the record is sufficient to review the issue") (quotation marks omitted); *Dream Palace v. Cty. of Maricopa*, 384 F.3d 990, 1005 (9th Cir. 2004) (applying *Patrin* to consider arguments raised for first time on appeal when intervening precedent changed the law); *In re Howell*, 731 F.2d 624, 627 (9th Cir. 1984) ("The court will consider an issue conceded or neglected below if the issue is purely one of law and the pertinent record has been fully developed."); *see also Singleton v. Wulff*, 428 U.S. 106, 121 (1976) (explaining that courts of appeals should consider addressing legal questions for the first time when "injustice might otherwise result").

This Court can and should consider this argument because it meets the *Patrin* criteria. *Valeant* is an intervening controlling decision, and application of *Valeant* at the pleading stage constitutes a pure question of law capable of resolution on the existing record. Defendants will suffer

no prejudice, as they have "a full opportunity to brief [their] response." *Dream Palace*, 384 F.3d at 1005.

Four additional factors support this Court exercising its discretion to decide this issue. First, *Valeant* is on point: It involves one of the same parties bringing a similar claim. It would be anomalous and promote confusion if this Court permitted such factually similar cases to reach different outcomes. *Cf.* Fed. R. App. P. 35(a)(1) (identifying the need "to maintain uniformity of the court's decisions" as important); *Ginzburg v. Martinez-Davila*, 2021 WL 4352377, at *1 (C.D. Cal. Aug. 12, 2021) (listing "ensuring uniform treatment of common questions of law and fact, and avoiding inconsistent rulings" as among the "interests of justice" courts consider in the transfer context); *Elec. Frontier Found. v. Off. of Dir. of Nat. Intel.*, 2009 WL 773340, at *4 (N.D. Cal. Mar. 23, 2009) (holding that "uniform treatment of similar cases" is an "interest of justice" favoring stays).

Second, in another case plaintiff has brought, the district court concluded that the public disclosure bar was not triggered—and so applying *Valeant* here would promote uniformity across circuits, too. *See*

*United States v. Janssen Biotech, Inc.*, 576 F. Supp. 3d 212, 227 (D.N.J. 2021).

Third, applying *Valeant* would simplify the appeal by obviating inquiry into whether plaintiff is an original source. As the district court recognized, there "is no binding authority on the question," ER-26, and applying *Valeant* would allow this Court to avoid unnecessarily deciding an issue of first impression. *See, e.g.*, *United States v Baccollo*, 725 F.2d 170, 172 (2d Cir. 1983) (declining to decide issue of first impression when alternate grounds were available).

Finally, the interests of justice favor adjudicating this argument because plaintiff seeks to vindicate not only his own interests, but also those of the Government, taxpayers, and beneficiaries. *Cf. Keating v. Off. of Thrift Supervision*, 45 F.3d 322, 324-25 (9th Cir. 1995) (holding, in the stay context, that the "interests of justice" include "the efficient use of judicial resources," "the interests of persons not parties to the civil litigation," and "the interest of the public"). The district court already held—in part of the decision that was not reversed—that plaintiff's complaint states a claim that defendants violated the FCA, cheating the Government out of at least hundreds of millions of dollars. ER-109−20.

43

The public disclosure bar has nothing to do with whether defendants committed fraud, or the merits of the claims in the complaint. Accordingly, if, under a correct application of the law, the public disclosure bar does not apply to this action, then this Court should not allow it to apply when doing so would allow defendants to escape accountability regardless of the merits of the claims against them.

For these reasons, the Court should hold that under *Valeant*, the publicly disclosed transactions here were not substantially the same as those alleged in plaintiff's complaint.

## II.    Plaintiff Is an Original Source

If the Court determines that a public disclosure occurred, it should still reverse because plaintiff is an "original source." *See* 31 U.S.C. § 3730(e)(4)(A), (B).

There are two paths to original source status. The first—which is not applicable here—is available to an individual who "(i) prior to a public disclosure . . . has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based." *Id*. § 3730(e)(4)(B). The second (applicable) path is available to an individual who (ii) "has knowledge that is independent of and materially

adds to the publicly disclosed allegations or transactions" and provided "the information to the Government before filing an action under this section." *Ibid*.

Here, under the second path, it was plaintiff's "knowledge" (i.e., specialized expertise in pharmaceutical patents), that enabled him to uncover defendants' fraud and bring an action to redress it. Such specialized expertise qualifies plaintiff as an original source because it is "knowledge" that is "independent of" and "materially adds to" the facially innocuous information in the public domain. Plaintiff also provided "information" related to that knowledge to the Government prior to filing this action. ER-141, ¶ 10.

## A. Plaintiff's Expertise in Patent Law, and Specifically Pharmaceutical Patents, Qualifies as "Knowledge"

Start with the word "knowledge." Merriam-Webster's defines "knowledge" as "the fact or condition of knowing something with familiarity gained through experience or association"; "acquaintance with or understanding of a science, art, or technique"; "the fact or condition of being aware of something"; "the circumstance or condition of apprehending truth or fact through reasoning"; and "the fact or condition of having information or of being learned." *Knowledge*, Merriam-Webster

Dictionary (2023). The Supreme Court, too, has embraced the broad definition of "knowledge" as "the fact or condition of being aware of something." *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 142 S. Ct. 941, 946 (2022) (quotation marks omitted). In *Unicolors*, the Court held that this definition is most naturally read to include "knowledge of the law as well as the facts." *Id.* at 947. Thus, properly interpreted according to its plain meaning, the word "knowledge" does not *exclude* any category of knowledge, e.g., subject-matter expertise.

Knowledge of patent law plainly constitutes "knowledge" under the plain meaning of the term. Patent law is a specialized field, sitting at the intersection of law and science, requiring substantial study in addition to what an ordinary law school education provides. Practitioners must have a scientific or technical background as well as a law degree, and they must take an additional examination testing their knowledge of patent examination procedures before they may practice before the USPTO. *See generally* USPTO, General Requirements Bulletin for Admission to the Examination for Registration to Practice in Patent Cases before the United States Patent and Trademark Office (2023), Part III (Scientific and Technical Training Requirements for Admission to the

Examination), *available at* https://tinyurl.com/2facfh9c; *see also* 37 C.F.R. § 11.7.

Not only that, but to be effective, practitioners typically must possess further specialized knowledge in particular technical or scientific fields. Thus, the Supreme Court has explained that patent law is "a field where so much depends upon familiarity with specific scientific problems and principles not usually contained in the general storehouse of knowledge and experience." *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 327 (2015) (quotation marks omitted). And both the Supreme Court and this Court have recognized that expertise in patent law is "distinctive knowledge" in a way that general legal expertise is not. *Pierce v. Underwood*, 487 U.S. 552, 572 (1988); *Nadarajah v. Holder*, 569 F.3d 906, 912 (9th Cir. 2009); *Nat. Res. Def. Council, Inc. v. Winter*, 543 F.3d 1152, 1158 (9th Cir. 2008). If expertise in patent law qualifies as "distinctive knowledge," it plainly also qualifies as "knowledge."

That's not all. Plaintiff's knowledge focuses on patents for pharmaceuticals specifically, a rapidly evolving and highly technical field. He honed this knowledge through years of diligent study and practice—and maintaining it requires him to stay current on the latest

47

legal and scientific developments. That is "knowledge" under the plain meaning of the term; any limitation that excludes it is entirely atextual.

The district court impermissibly added just such an atextual limitation by erroneously limiting "knowledge" to knowledge *of the defendant's conduct*, i.e., historical facts about what the defendant did. ER-25. But that subject-matter limitation has no basis in the statutory text—and is contrary to the decision Congress made. If Congress wanted to add a subject-matter limitation to the knowledge covered by the original source definition, it knew how to do so. Indeed, Congress included a subject-matter limitation in the 1986 version of the statute, which required relators to have "direct and independent knowledge *of the information on which the allegations are based*." 31 U.S.C. § 3730(e)(4)(B) (1986) (emphasis added). And Congress also added a subject-matter limitation in the *other* (first) path to original source status in the 2010 statute, which covers relators who, prior to a public disclosure "voluntarily disclose[] to the Government the information *on which allegations or transactions in a claim are based*." 31 U.S.C. § 3730(e)(4)(B) (emphasis added). It would have been easy for Congress to include a similar limitation—or even a more explicit one—in the

second path to qualify as an original source by requiring the relator to have "knowledge of the defendant's conduct," or "knowledge of the facts underlying the allegations."

Congress did no such thing. Instead, Congress defined the qualifying knowledge by its relationship to the public disclosures. Under the revised statute, qualifying "knowledge" under the second path must only be "independent of and materially add[] to the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(B). It is well-established that "[w]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, we generally take the choice to be deliberate." *Badgerow v. Walters*, 142 S. Ct. 1310, 1318 (2022). That inference is especially strong when, as here, Congress was aware of judicial decisions interpreting the relevant statutory language to require only factual knowledge, and was seeking to overrule those decisions. Here, Congress refrained from including any subject-matter limitations under the second path. The Court "may not narrow [the] provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1725 (2020).

In conflict with these controlling authorities, the district court concluded that because the statute requires the plaintiff to "voluntarily provide[] the information to the Government before filing an action under this section," 31 U.S.C. § 3730(e)(4)(B), the word "knowledge" must refer to historical facts, as opposed to expertise. ER-25. In the district court's view, it would be strange for a relator to provide expertise to the Government, and so "information" cannot refer to expertise. The district court apparently further assumed that "information" and "knowledge" in the original source definition must mean the same thing—and reasoned that "information" and "knowledge" therefore both must refer only to historical facts. ER-25.

The district court's inferential gymnastics do not justify ignoring the broad, plain meaning of the word "knowledge." They also fall flat of their own accord. For the district court to have a chance of being correct, three propositions must be true. First, the word "information" must refer only to historical facts (and not expertise). Second, the words "knowledge" and "information" in the original source definition must be coterminous. Third, the district court must be correct that Congress did not intend for

50

relators to provide expertise to the Government. All three propositions are wrong.

The district court cited no definition of "information" that excludes legal expertise; and the exclusion is wrong as a matter of plain English usage as recognized in recent Supreme Court precedent. Thus, in *United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391 (2023), the defendants argued that the word "information" in the FCA's scienter provision "refer[s] only to purely factual information." *Id*. at 1400 n.4. The Supreme Court rejected that argument, holding that "the definition of 'information' is broad, referring to all 'knowledge obtained from investigation, study, or instruction.'" *Ibid*. (quoting Webster's New Collegiate Dictionary 592 (1975)). The Court thus held that legal conclusions count as "information," such that defendants who act without belief that their conduct was lawful act with scienter. *See id*. at 1401.

It is "the normal rule of statutory interpretation that identical words used in different parts of the same statute are generally presumed to have the same meaning." *IBP, Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). No special circumstances warrant a departure from that rule here, so this Court should apply that same broad definition to the word "information"

in the FCA's original source definition. Under the dictionary definition adopted by the Supreme Court, "knowledge" of patent law ("obtained" from "study" and "instruction") as well as conclusions drawn from an "investigation" relying on that knowledge plainly qualify as "information," and the district court was wrong to hold otherwise.[2]

The district court was also wrong to assume that the "knowledge" the relator possesses and the "information" the relator provides to the Government must be completely congruent. The original source definition imposes two different requirements: a requirement to *have* "knowledge" that is independent of and materially adds to the publicly disclosed transactions; and a requirement to *provide* "information" to the Government before filing (which is not subject to the "independent" and "materially adds" qualifications). 31 U.S.C. § 3730(e)(4)(B). Although

---

[2] The district court cited Supreme Court precedent interpreting the 1986 version of the public disclosure bar, which held that the word "information" referred to the "information underlying [the relator's] allegations," as opposed to "the information underlying a publicly disclosed allegation." *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 471 (2007). But this precedent has no bearing on whether "information" is limited to historical facts to the exclusion of subject-matter expertise— because expertise can also be part of the information underlying a relator's claim. Nothing in *Rockwell* says otherwise.

these requirements are related, they are distinct—and the district court was wrong to conflate them. After all, if Congress had wanted the "information" in the second requirement to be exactly the same as the "knowledge" in the first, it could have easily required the relator to provide the "knowledge" to the Government, and left the word "information" out of the definition altogether. By using two different words, Congress signaled that the two need not be congruent.

The better reading of the statute is that the unqualified term "information" is broader than the specific "knowledge" required by the statute. Thus, the "information" should include or be derived from the relator's "knowledge," and show how that knowledge underlies the relator's claim. Such "information" would naturally include both the relator's "knowledge" (e.g., expertise), as well as the results of applying such knowledge (e.g., conclusions or additional facts that that reveal previously hidden fraud). Here, the "information" that plaintiff provided to the Government was his specialized expertise, and at a minimum, the six categories of information discussed above at pp.33–38. All of these fall under the plain meaning of "information" because they consist of

knowledge obtained from plaintiff's "investigation, study, or instruction." *SuperValu,* 143 S. Ct. at 1400, n.4.

Finally, the district court's intuition that it would make little sense to require relators to provide expertise to the Government is simply wrong. If fraud is being committed, but the Government lacks the resources or expertise to detect it, then it makes perfect sense for relators to provide expertise to the Government. Indeed, the State of California filed a statement of interest in this very litigation, explaining that:

> We are not aware of any government agency that regularly monitors patent filings to determine whether there has been a material omission or misrepresentation in applications for pharmaceutical patents, particularly given the specialized expertise and amount of resources that would be required to do so. We therefore welcome the efforts of relators like Mr. Silbersher to help identify instances where drug patents are not just invalid, but fraudulent—particularly in a case like this, where there was apparently no preexisting government investigation concerning the alleged fraud.

ER-54–55.

The public disclosure bar's architects similarly commented that relators who use "their education, training, experience, or talent to uncover a fraudulent scheme from publicly available documents, should be allowed to file a *qui tam* action." 145 Cong. Rec. E1546-01, at *E1547.

That is because when relators share their expertise with law enforcement, the Government obtains the maximum benefit from the participation of an informed citizenry in the shared enterprise of detecting and redressing complex and novel frauds. By contrast, adopting a crabbed, atextual definition of "knowledge" discourages industry experts from trying to identify fraud or coming forward when they do—undermining one of the FCA's principal objectives.

## B. Plaintiff's Knowledge Is "Independent of" the Publicly Disclosed Transactions

Plaintiff's specialized knowledge is also "independent" of the public disclosures. The word "independent" means "not dependent," as in "not requiring or relying on something else," or "neither deducible from nor incompatible with another statement." *Independent*, Merriam-Webster Dictionary (2023); *see also, e.g.*, *United States ex rel. Rahimi v. Rite Aid Corp.*, 3 F.4th 813, 829-30 (6th Cir. 2021) (holding that "a relator's knowledge is 'independent' if it does not depend or rely upon the public disclosure") (quotation marks omitted). Plaintiff gained his knowledge of patent law before the facts of this case transpired, through separate study—and not as a result of the public disclosures. Moreover, no matter how much a person knew about the material in the patent prosecution

histories, that would not allow him to deduce plaintiff's distinct knowledge of patent law and pharmaceutical markets. Plaintiff's knowledge does not depend on the public disclosures in any way—and is accordingly "independent" of them.

The district court concluded otherwise, relying on this Court's decision in *Amphastar Pharmaceuticals Inc. v. Aventis Pharma SA*, 856 F.3d 696 (9th Cir. 2017), which held under the 1986 version of the statute that "[t]o prove 'independent' knowledge, relators have to show they had relevant evidence of fraud prior to the public disclosure of the allegations." *Id.* at 705 (quotation marks omitted). This argument suffers from the same problem as the district court's interpretation of "information": it assumes, without any basis in the 2010 statute, that qualifying knowledge is limited to "evidence of fraud," i.e., factual information about what the defendant did. As the district court acknowledged, *Amphastar* interpreted the 1986 statute, which referred to "independent knowledge of the information on which the allegations are based." 31 U.S.C. § 3730(e)(4)(B) (1986). Thus, knowledge in that prior version of the statute carried a subject-matter limitation that at least arguably limited it to factual information. As explained *supra*,

however, Congress removed that limitation from the relevant portion of the original source definition in 2010—in part to overrule decisions improperly limiting the range of qualifying knowledge. The word Congress left behind, "independent," does not suggest that knowledge must be of historical facts about the defendant's conduct, nor that it must be knowledge of "relevant evidence of fraud." *Amphastar*, 856 F.3d at 705. Instead, the word "independent" takes its ordinary meaning, described *supra*. Here, plaintiff's knowledge of patent law is "independent" because he acquired it before and without reference to the public disclosures in this case.

To the extent the district court believed that plaintiff's knowledge is not "independent" of the publicly disclosed transactions because plaintiff inferred fraud by applying his knowledge to those transactions, that is a misinterpretation of the statute. The word "independent" refers to how the plaintiff obtained his knowledge—not to how he uses it. Indeed, in every case in which the public disclosure bar has been triggered and the original source exception met, the plaintiff will be combining knowledge he obtained independently with the publicly disclosed information (which is why the definition asks whether the

plaintiff's knowledge "materially adds" to the publicly disclosed transactions).

The district court may have meant that the "information" plaintiff provided to the Government was not entirely "independent" of the public disclosures—but the statute does not impose any independence requirement on the information the relator provides; it only imposes it on the knowledge the relator possesses. That requirement is met here. The contrary rule would require dismissal of complaints that rely in any part on public disclosures—even if the complaint also supplies independent information. That conflicts with the statutory text, and is nonsensical because there is no sound reason to force original-source relators to ignore credible public disclosures of fraud when pleading their cases.

## C. Plaintiff's Knowledge "Materially Adds" to the Publicly Disclosed Transactions

Under plaintiff's interpretation, the most important requirement is that the plaintiff's knowledge must materially add to the publicly disclosed allegations or transactions. This is true whether a relator is asserting non-public facts, or instead relying on expertise. This is the most important requirement because when the relator's contributions to the understanding of the fraud are immaterial, the relator's action is

58

properly characterized as "parasitic"; such a relator has done nothing significant to bring fraud to light—and therefore is not entitled to the rewards reserved for relators who do. On the other hand, when the relator's knowledge materially contributes to the detection and redress of fraud on the Government, the action is not parasitic, and the relator thus fulfills the purpose of the FCA and the original source exception.

Here, plaintiff's knowledge "materially adds" to the publicly disclosed transactions by revealing an otherwise-invisible fraud. Materiality in this setting requires the relator to "bring something to the table that would add value for the government." *Rahimi*, 3 F.4th at 831; *see also United States ex rel. Moore & Co. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 298-99 (3d Cir. 2016) ("[A] relator must contribute significant additional information to that which has been publicly disclosed so as to improve its quality."); *United States ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 757 (10th Cir. 2019) (holding that "new information that is sufficiently significant or important that it would be capable of 'influenc[ing] the behavior of the recipient'—i.e., the government—ordinarily will satisfy the materially-adds standard").

Naturally, the "materially adds" inquiry turns substantially on the nature of the public disclosures. When public disclosures clearly allege fraud, it will be more difficult for a relator's knowledge to materially add to those allegations because the defendant's misconduct may already be out in the open. On the other hand, if the only information in the public domain is facially innocuous transactions, then a relator who can spot fraud in those transactions is more likely to materially add to them. That principle is highly relevant in cases like this one, in which the qualifying public disclosures do not explicitly identify any wrongdoing, and even government lawyers trained to spot fraud would find it essentially impossible to discern defendants' misconduct unless somebody with specialized expertise (like plaintiff) told them where to look and what to look for.

Accordingly, this Court should hold that knowledge "materially adds" to publicly disclosed transactions if that knowledge enables the plaintiff to consider facially innocuous public information and recognize fraud. This conclusion is supported by this Court's decision in *Valeant*, which held that by filling "the gaps by putting together the material elements of the allegedly fraudulent scheme," the allegations in

60

plaintiff's complaint allowed the "full picture" of defendants' fraud to emerge, where it was previously hidden and "scattered" in various sources, each of which only contained "a piece of the puzzle." 2023 WL 4940429, at *10. Here, as in *Valeant*, plaintiff's knowledge enabled him to provide the Government "a critical fact necessary for scienter: [defendants] took conflicting positions in their patent prosecutions" of two separate patent applications. *Id.* at *9; ER-156, ¶¶ 67−68; ER-158−62, ¶¶ 74−78, 81−84. *Valeant*'s holding applies with equal force to whether the substantially identical allegations in this case "materially add" to what was disclosed in the patent prosecution files for the purposes of determining plaintiff's original source standing.

Consistent with *Valeant*, multiple cases hold that when a relator performs an analysis of information that does not, on its face, reveal fraud, the relator is an original source. For example, in *Illinois ex rel. Edelweiss Fund LLC v. JPMorgan Chase & Co.*, No. 2017-L-000289 (Ill. Cook. Cnty. Feb. 1, 2019),[3] an Illinois court denied a motion to dismiss

_____

[3] A copy of the decision is available online at:
https://ww1.prweb.com/prfiles/2019/02/04/16078367/Illinois%20ex%20re l%20Edelweiss%20v%20JPMorgan%20et%20al.pdf (last accessed Aug. 24, 2023).

on original source grounds, considering a statute worded substantively identically to the operative federal version. There, the defendants argued, and the court agreed, that the relator had conducted statistical analyses on publicly available data. *See id.* at 10. But the original source exception applied because "nothing in the available raw data indicate fraudulent activity by the defendants as alleged," and it was only the relator's analysis that revealed the fraud. *Id.* at 12.

Similarly, in *United States ex rel. Osheroff v. Tenet Healthcare Corp.*, 2012 WL 2871264, at *3 (S.D. Fla. July 12, 2012) the court held that the public disclosure bar did not apply when the complaint was based on the "[r]elator's synthesis and analysis of otherwise apparently innocuous, garden-variety real estate/financial information." Although that case was about whether a public disclosure occurred at all, the court commented that in light of the relator's "independent synthesis and analysis of Defendant's seemingly innocuous financial materials, it is highly probable that Plaintiff would also satisfy the 'original source' analysis." *Id.* at *4 n.7.

The Seventh Circuit has similarly acknowledged that "a plaintiff might be an original source even though her knowledge of every isolated

element of the fraud is based upon public disclosures"; specifically, "[i]n an exceptionally or unusually complicated allegation of fraud each piece of the information may be publicly disclosed, yet the fraud itself may remain hidden until some perspicacious plaintiff puts it in perspective." *United States v. Bank of Farmington*, 166 F.3d 853, 864 (7th Cir. 1999), *overruled on other grounds by Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907 (7th Cir. 2009).

The public disclosure bar's drafters forcefully made the same argument before implementing the 2010 amendments. Senator Grassley, who was the architect of the public disclosure bar in 1986 and also of the 2010 amendments, expressed "dismay . . . with the courts' crabbed interpretations" of the 1986 statute. 145 Cong. Rec. E1546-01, at *E1546. In particular, the Senator "forcefully . . . disagree[d] with cases holding that *qui tam* suits are barred if the relator obtains some, or even all, of the information necessary to prove fraud from publicly available documents." *Ibid*. Instead, he believed that relators who use "their education, training, experience, or talent to uncover a fraudulent scheme from publicly available documents, should be allowed to file a *qui tam* action." *Ibid*.

63

On the other hand, cases holding "that a relator must possess substantive information about the particular fraud, rather than merely background information which enables a putative relator to understand the significance of a publicly disclosed transaction or allegation, undermine Congress' explicit goals." *Ibid.* (cleaned up). "If, absent the relator's ability to understand a fraudulent scheme, the fraud would go undetected, then we should reward relators who with their talent and energy come forward with allegations and file a qui tam suit"—especially "where a relator must piece together facts exposing a fraud from separate documents." *Ibid*. Thus, the Senator wanted the original source exception to apply to "a relator who learns of false claims by gathering and comparing data," and did not wish to limit it to those who witness fraud directly. *Ibid*. The 2010 amendments accomplish that objective because education, training, experience, and talent constitute "knowledge" that is "independent" of publicly disclosed transactions, and "materially adds" to those disclosures by showing that facially innocuous information actually signals fraud.

The structure of the statute and the role the original source exception plays vis-à-vis the public disclosure bar reinforce that expertise

can materially add to public disclosures. The original source exception *only* applies when the public disclosure bar has already been triggered, *i.e.*, when all the material elements of the fraud have been publicly disclosed. For the original source exception to do any meaningful work, then, it must reach those situations. But if the type of knowledge that "materially adds" to public disclosures were limited to historical facts that are different from the disclosed ones, the "substantially the same" trigger for the public disclosure bar and the "materially adds" component of the original source exception would overlap almost entirely, rendering the original source exception vanishingly narrow. For example, if a relator alleged important facts about the defendant's conduct in addition to those that have been publicly disclosed (thus qualifying as an original source under the narrow view), the court would likely never reach the original source inquiry in the first place; instead, it would dispose of the defense by concluding that the public disclosures are not "substantially the same" as the relator's allegations—such that the public disclosure bar is not triggered at all. 31 U.S.C. § 3730(e)(4)(A). Or, to put the shoe on the other foot, if knowledge that "materially adds" is limited only to important historical facts that have not been publicly disclosed, then it is

65

hard to imagine many situations in which a district court finds that the relator's allegations or transactions are "substantially the same" as the publicly disclosed ones, but that the relator has also somehow "materially added" to those allegations or transactions. Because the original source exception *only* applies when the public disclosure bar has been triggered, the inquiries should not be construed to overlap so severely. *See, e.g.*, *Reed*, 923 F.3d at 757. Instead, the Court should recognize that Congress created space for knowledge that allows relators to proceed *even when* all the essential elements of a fraud have been publicly disclosed—and such knowledge will often come in the form of expertise.

To be sure, some cases decided before *Valeant* go the other way. For example, the district court cited a handful of nonbinding cases for the proposition that expertise alone does not materially add to public disclosures. These are unpersuasive, to say the least. *Roe v. Stanford Health Care*, 2022 WL 796798, at *1 (9th Cir. Mar. 15, 2022), is a four-paragraph unpublished opinion that addressed this issue in a single sentence with a citation to precedent interpreting the 1986 statute (which did not include the "materially adds" language). Moreover, the decision did not purport to hold that expertise *never* materially adds to

public disclosures; it merely held—for unknown reasons—that the unidentified expertise of the relator in that case did not materially add. The same was true in the unpublished opinion in *United States Hastings v. Wells Fargo Bank, NA, Inc.*, 656 F. App'x 328, 331-32 (9th Cir. 2016), which did not address expertise at all, but instead opined that the specific relator there provided only "speculation" that did not "add value" to what the Government "already knew." And the district court's opinion in *United States ex rel. Jones v. Sutter Health*, 499 F. Supp. 3d 704, 719 (N.D. Cal. 2020), merely applied *Hastings* and the now-reversed district court decision in *Valeant* to hold that the relator there provided only "immaterial detail."

California's statement of interest in this case belies any such characterization of plaintiff's knowledge. ER-54–55. Thus, even if these cases were precedential (and they are not), they would not control the distinct facts here, especially in light of this Court's precedential decision in *Valeant*.

More broadly, cases holding that specialized expertise can never materially add to publicly disclosed transactions are rooted in a premise that is not present here. These cases assume that the material elements

of the fraud have been clearly identified in the public disclosures. In that situation, it may make sense to hold that the relator's expertise does not materially add to the disclosures because the misconduct is out in the open. But when, as here, the misconduct is effectively invisible except to people with specialized expertise, the premise does not hold, and the result should be different.

In any event, these cases' analysis is unmoored from the statutory text. There is no textual argument for why the application of expertise to facts cannot "materially add" to those facts. Instead, the textual inquiry focuses on whether the relator's knowledge provides the Government with useful information that is not evident from the face of the disclosures themselves. For example, when a relator merely tacks an FCA claim on to a clearly identified instance of misconduct, his knowledge of FCA law does not materially add to the disclosures because the Government has that knowledge in spades. But when a relator uses specialized technical expertise to discern fraud from innocuous transactions, the opposite is true.

Here, plaintiff's specialized knowledge of patent law meets the "materially adds" standard because without his knowledge, it would not

have been possible to conclude: (1) that defendants were dishonest (as opposed to honest or perhaps negligent) during the prosecution of the Went Patents and '009 Patent; (2) that these patents specifically (as opposed to others) were preventing generic competitors from entering the market; and (3) that defendants' misconduct vis-à-vis the USPTO led to the presentment of false claims for payment to government health care programs. Plaintiff was therefore able to provide the six categories of information detailed *supra* pp.33–38, along with the other allegations in the complaint. Each of those allegations materially adds to the facially innocuous public disclosures—and collectively, they clearly do, as *Valeant* confirms.

Plaintiff's knowledge also is not the sort that can be applied casually or quickly. To apply his knowledge, plaintiff had to engage in substantial leg work: he had to retrieve the prosecution histories for myriad patents using the USPTO's ungainly system, then review those histories and the underlying documents firsthand to discover inconsistencies and contradictions that would be invisible to a lay person, and then combine the information he gleaned with additional information about other patents and the status of generic competitors to

determine whether defendants had engaged in actionable fraud. For example, to find that Dr. Went's 2010 declaration was false, plaintiff had to review other potentially relevant patent prosecution dockets to find the abandoned '824 Application, review the materials therein to find Dr. Went's 2012 declaration, and discern that this declaration reported the true results of the ME110 study, which contradicted Dr. Went's 2010 declaration. This makes it even more clear that without plaintiff's efforts, defendants' fraud would have gone undetected by the Government. In that sense, too, plaintiff's knowledge materially added to what the Government could discern from the public disclosures.

Furthermore, plaintiff's knowledge not only "materially adds" to the publicly disclosed transactions at the pleading stage, but will continue to do so. Plaintiff is qualified not only to bring this case but also to carry it forward because he can anticipate, understand, and help refute the arguments defendants will inevitably make to justify their conduct. That is critical because the FCA contemplates not only that relators will bring cases to the Government's attention, but also litigate those cases when the Government is unable or unwilling. *See, e.g.*, S. Rep. No. 99-

345, at 23–24; 145 Cong. Rec. E1546-01, at *E1546. For this case, Silbersher is the ideal plaintiff, and a paradigmatic original source.

The district court did not seriously grapple with the "materially adds" prong of the inquiry, arguing instead that other "language in the amended definition," i.e., "independent" and "information," made it irrelevant. ER-25–26. That analysis was flawed for the reasons provided above. Moreover, by minimizing the "materially adds" component, the court gave short shrift to the most important part of the original source definition—and the purpose of the exception, which is to allow relators with information that helps the Government redress fraud. This repeats the error that prompted Congress to amend the 1986 statute in the first place. This Court should not double down on that mistake. It should hold instead that a relator's expertise—applied to facially innocuous publicly disclosed transactions to reveal a hidden fraud—materially adds to those disclosures.

71

## D. Plaintiff Voluntarily Provided the Relevant Information to the Government Before Filing This Lawsuit

The complaint confirms that plaintiff voluntarily provided the relevant information concerning his allegations to the Government before filing this action. ER-141, ¶10. Because this allegation is not an averment of fraud, it is governed by Federal Rule of Civil Procedure 8, which requires a "short and plain statement." *Cf. Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003).

In fact, a draft of the complaint with a disclosure statement was sent to the Government and the Plaintiff States on May 11, 2018, eleven days before this suit was commenced. Although that fact was not in the record, it has never been disputed, and should be accepted as true because it could easily be added to an amended complaint or supplemental declaration. To the extent defendants intend to dispute this fact (so far they have not expressed any such intention), they may do so at summary judgment on a full evidentiary record. *Cf. Malhotra v. Steinberg*, 770 F.3d 853, 857 (9th Cir. 2014) (noting that the district court first held an evidentiary hearing to resolve disputed factual issues before addressing whether relator was an original source).

72

## CONCLUSION

The district court's decision should be reversed.

Respectfully submitted,

*s/ Tejinder Singh*

Tejinder Singh
SPARACINO PLLC
1920 L St. NW, Suite 835
Washington, DC 20036
202.629.3530
tejinder@spracinopllc.com

Nicomedes Sy Herrera
Bret D. Hembd
HERRERA KENNEDY LLP
1300 Clay Street, Suite 600
Oakland, CA 94612
510.422.4700
NHerrera@HerreraKennedy.com
BHembd@HerreraKennedy.com

Warren T. Burns
Christopher J. Cormier
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, TX 75202
469.904.4550
WBurns@BurnsCharest.com
CCormier@BurnsCharest.com

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

31 U.S.C. § 3729 ................................................................... A1

31 U.S.C. § 3730(b) .............................................................. A5

31 U.S.C. § 3730(e)(4) .......................................................... A7

31 U.S.C. § 3730(e)(4) (1986) ............................................... A7

---

## 31 U.S.C. § 3729, False Claims

(a) Liability for certain acts.

(1) In general. Subject to paragraph (2), any person who

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

(D) has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property;

(E) is authorized to make or deliver a document certifying receipt of property used, or to be used, by the Government and, intending to defraud the Government, makes or delivers the receipt without completely knowing that the information on the receipt is true;

(F) knowingly buys, or receives as a pledge of an obligation or debt, public property from an officer or employee of the Government, or a

member of the Armed Forces, who lawfully may not sell or pledge property; or

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

(2) Reduced damages. If the court finds that

(A) the person committing the violation of this subsection furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation within 30 days after the date on which the defendant first obtained the information;

(B) such person fully cooperated with any Government investigation of such violation; and

(C) at the time such person furnished the United States with the information about the violation, no criminal prosecution, civil action, or administrative action had commenced under this title with respect to such violation, and the person did not have actual knowledge of the existence of an investigation into such violation,

the court may assess not less than 2 times the amount of damages which the Government sustains because of the act of that person.

(3) Costs of civil actions.

A2

A person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages.

(b) Definitions. For purposes of this section

(1) the terms "knowing" and "knowingly"

(A) mean that a person, with respect to information

(i) has actual knowledge of the information;

(ii) acts in deliberate ignorance of the truth or falsity of the information; or

(iii) acts in reckless disregard of the truth or falsity of the information; and

(B) require no proof of specific intent to defraud;

(2) the term "claim"

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government

(I) provides or has provided any portion of the money or property requested or demanded; or

A3

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;

(3) the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4) the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

(c) Exemption from disclosure.

Any information furnished pursuant to subsection (a)(2) shall be exempt from disclosure under section 552 of title 5.

(d) Exclusion.

This section does not apply to claims, records, or statements made under the Internal Revenue Code of 1986.

A4

**31 U.S.C. § 3730(b)**

(b) Actions by private persons.

(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government. The action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting.

(2) A copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

(3) The Government may, for good cause shown, move the court for extensions of the time during which the complaint remains under seal under paragraph (2). Any such motions may be supported by affidavits or other submissions in camera. The defendant shall not be required to respond to any complaint filed under this section until 20 days after the complaint is unsealed and served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure.

(4) Before the expiration of the 60-day period or any extensions obtained under paragraph (3), the Government shall—

(A) proceed with the action, in which case the action shall be conducted by the Government; or

(B) notify the court that it declines to take over the action, in which case the person bringing the action shall have the right to conduct the action.

(5) When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action.

**31 U.S.C. § 3730(e)(4)**

(A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

    (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

    (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or

    (iii) from the news media,

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

------------------------

**The version of 31 U.S.C. § 3730(e)(4), as amended in 1986, read:**

(A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

(B) For purposes of this paragraph, "original source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-15613

I am the attorney or self-represented party.

**This brief contains** 13,931 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- ☐ it is a joint brief submitted by separately represented parties.
- ☐ a party or parties are filing a single brief in response to multiple briefs.
- ☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated _____.

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/Tejinder Singh **Date** 8/30/2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing Appellant's Brief to be filed using the Court's CM/ECF system on August 30, 2023. All counsel to parties to the case are ECF users.

<u>s/Tejinder Singh     </u>

August 30, 2023

## STATEMENT OF RELATED CASES

This Court's decision in *Silbersher v. Valeant Pharmaceuticals, Int'l, Inc.*, No. 20-16176, 2023 WL 4940429 (9th Cir. Aug. 3, 2023), constitutes a related case because it raises the same or closely related issues as this case, specifically the application of the "substantially the same" test under the public disclosure bar. Although this Court issued its opinion in *Valeant* on August 3, 2023, the case remains pending because the mandate has not yet issued and the defendants have sought an extension of time to seek rehearing.

s/Tejinder Singh

August 30, 2023